UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Stacey Haire,

       *Plaintiff*,

vs.

Farm & Fleet of Rice Lake, Inc.,
d/b/a Blain's Farm & Fleet of
Jackson, a Wisconsin corporation,

       *Defendants.*

Hon.

Magistrate

Case No.

---

**GASIOREK MORGAN**
By:   Sam Morgan (P36694)
*Attorneys for Plaintiff*
30500 Northwestern Hwy, Suite 425
Farmington Hills, Michigan 48334
(T) (248) 865-0001
(F) (248) 865-0002
smorgan@work-lawyers.com

---

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

PLAINTIFF, Stacey Haire, by and through her attorneys, GASIOREK MORGAN, and for her Complaint against Defendants, states as follows:

1.    This cause of action asserts claims of sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, as Amended, 42 USC 2000e, *et seq*, (hereinafter "Title VII"), and the Michigan Elliott Larsen Civil Rights Act (hereinafter referred to as the "ELCRA"); and, violation of the

confidentiality requirements guaranteed by Americans with Disabilities Act

("ADA"), 42 USC § 12101, *et. seq.*, the Michigan Persons with Disabilities

Civil Rights Act ("PWDCRA"), MCL § 37.1101 *et seq.*

2.     Plaintiff is a resident of the City of Jackson, County of Jackson,

State of Michigan.

3.     Defendant is a Wisconsin corporation duly authorized to do

business in the State of Michigan, and operating a retail store in the City of

Jackson, County of Jackson, State of Michigan.

4.     At all relevant times Defendant has and continues to employ 20

or more employees.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over Plaintiff's Title VII

and ADA claims pursuant to 28 USC §§ 1331 and 1343.

6.     This Court has supplemental jurisdiction over Plaintiff's ELCRA

and PWDCRA claims under 28 USC § 1367, and Plaintiff's federal law claims

substantially predominate over Plaintiff's state law claims.

7.     This Court has personal jurisdiction over Defendant because it

conducts regular and systematic business activities in the State of Michigan.

8.     Venue is proper in this judicial district pursuant to 28 USC §

1391(b).

9.     Plaintiff timely filed a charge of sexual harassment, disability discrimination and retaliation against Defendant with the Equal Employment Opportunity Commission on June 24, 2019, within 300-days of her last day of work on April 4, 2019. (Exhibit A, attached hereto)

10.    Plaintiff has timely filed this action within 90-days of receiving a Notice of the Right to Sue from the Equal Employment Opportunity Commission dated January 28, 2021. (Exhibit B, attached hereto).

## GENERAL ALLEGATIONS

11.    Plaintiff commenced employment with Defendant on or about September 19, 2018.

12.    Plaintiff was initially employed by Defendant in the position of Sales Associate assigned to its Candy Department.

13.    As a Sales Associate, Plaintiff was primarily responsible for stocking shelves, setting prices, providing customer service, maintaining merchandise displays, cleaning retail areas, product inventory, and moving excess items and empty pallets to the warehouse, and breaking down cartons.

14.    The Candy Department, and the employees in that department, including Plaintiff, were under the supervision of one of Defendant's four (4) Assistant Store Managers ("ASM").

15.     At the outset of Plaintiff's employment with Defendant, the ASM that oversaw the Candy Department was an individual with the initials "AL."

16.     Defendant delegated to AL the authority to direct Sales Associates like Plaintiff in their employment, to evaluate their performance, initiate and impose disciplinary action, and otherwise substantially affect the terms and conditions of their employment.

17.     The Sales Associates in the Candy Department were also directed in their day-to-day work activities by Department Head, and during Plaintiff's tenure of employment with Defendant, the Department Head was an individual with the initials "KG."

18.     KG reported directly to AL.

19.     KG is an extremely nosey, self-centered and manipulative individual who regularly bullies his co-workers, instigates workplace gossip about co-workers, makes inappropriate and offensive statements, and offers unsolicited opinions about various matters unrelated to the job or Defendant's business, usually on a personal level relative to one of his coworkers, and frequently critical, judgmental and insensitive.

20.     KG also seems to believe that his status as a Department Head entitles him to exercise supervisory authority over Sales Associates like Plaintiff, and he acts on that belief by assigning daily tasks in a manner that

4

enables him to bully and/or punish a Sales Associate at his will, and avoid his own work responsibilities.

21.   In early November 2018, KG started making sexually inappropriate comments to Plaintiff, and also started inappropriately personal and familiar with her.

22.   For example, there was an occasion when Plaintiff got her hair cut, KG commented upon the fact that Plaintiff did something with her hair, and Plaintiff acknowledged that she got a "trim," KG said that he "would not mind getting some trim, too."  KG made the statement clearly intending to inject sexual inuendo into the conversation, as if he thought he was being clever.

23.   Plaintiff's negative reaction to his comment seemed to motivate KG to become more aggressive with his improper comments and behavior when interacting with Plaintiff, including contriving opportunities to invade Plaintiff's personal space and touch her body.

24.   For example, KG demonstrated that he was particularly interested in Plaintiff's buttocks – frequently positioning himself to be standing behind Plaintiff when she was working, and staring at her buttocks. He also repeatedly came up from behind her, under the guise that he was

concerned her walkie-talkie looked like it may fall from her belt holster, as an excuse to touch Plaintiff in her waist and buttocks area.

25.    KG also exceed personal space boundaries when approaching Plaintiff to talk with her, conveying an apparent attempt to become more personally, and physically, familiar with her.

26.    During Plaintiff's 60-day evaluation with AL, in mid-to-late-November, Plaintiff reported to AL that she was uncomfortable with the creepy manner in which KG was interacting with her, specifically referencing the "trim" comment, the staring at her from behind, and the walkie-talking move to touch her buttocks.

27.    AL's reaction to Plaintiff's report was to say that he was sorry for KG's behavior and he would look into it.

28.    In the days and weeks that followed her 60-day evaluation and report to AL, Plaintiff did not observe or experience any difference in the way that KG interacted with her – if anything, he started to tease and bully her.

29.    For example, when she was in the Defendant's warehouse, and climbing a ladder to stock or remove inventory from a shelf, KG started a routine where he would stand at the bottom of the ladder and shake it, saying things like "you better be careful up there little girl," or "are you scared up there, girly?"

30.     KG also continued staring at her from behind and invading her personal space and finding ways to touch her.

31.     By early to mid-December, management was reorganized, AL became acting Store Manager, and an individual with the initials JW became ASM responsible to supervisor KG and Plaintiff in the Candy department.

32.     Plaintiff complained about KG's behavior to JW multiple times, with no remedial action resulting from the reports.

33.     In early January 2019, Plaintiff reported her concerns about KG's behavior to another ASM with the initials SW.

34.     Plaintiff thought that because SW was a woman, she would be more in-tune with Plaintiff's objections to KG's behavior.

35.     Unfortunately, the only thing SW seemed to be concerned with were Plaintiff's complaint about workload inequities and KG evading work by assigning it all to her, while defending Defendant's decision to reduce Plaintiff's scheduled work hours.

36.     No remedial action resulted from Plaintiff's first report to SW.

37.     KG had developed a friendship with JW by January 2019, and actually appeared to be confident that he could do and get away with anything he wanted while under JW's supervision.

7

38.     In January 2019, KG started making comments about one of their co-workers and his sexual orientation, telling Plaintiff that he and his girlfriend had a bet on whether or not the co-worker was gay.  KG remarked multiple times that several people thought the coworker was gay, and that his girlfriend was "a beard."

39.     The subject coworker was a friend of Plaintiff's, she found the comments offensive, and she objected to KG spreading gossip about his and his girlfriend's speculation about the coworker's sexual orientation.

40.     KG also initiated conversation with Plaintiff about having purchased undergarments for his girlfriend from Victoria's Secret, and at one point commenting about how the undergarments would fit Plaintiff.

41.     Plaintiff told KG that she did not appreciate him talking about the undergarments, and that she thought his interest in the subject was more for his own pleasure.  KG laughed as Plaintiff's response.

42.     Plaintiff then had a second meeting with SW, in late January 2019, where she reported her objection to the manner in which KG spoke to and interacted with her.

43.     Plaintiff reported to SW details about how KG was spreading gossip and passing judgment on her coworker's sexual orientation, his commentary about the undergarments that he had purchased for his

8

girlfriend, the incidents of KG staring at her buttocks, the incidents of KG touching her inappropriately, the fact that she reported much of that to AL at her 60-day evaluation and no remedial action had been taken.

44.   SW told Plaintiff that she would look into it, but nothing was done about KG's behavior.

45.   KG's inappropriate comments continued, expanding to discussing the subject of the ongoing debate about whether transgender people should be allowed to use the bathroom of the gender they identified with, and mocking the manner in which some transgender people allegedly choose to use the pronoun "they," instead of "he" or "she."

46.   KG made clear that he had a strong opinion about transgender issues, similar to his insistence on repeatedly discussing his belief that their coworker was gay and attempting to hide the fact that he was gay.

47.   Plaintiff was offended by KG's commentary on these subjects because they had nothing to do with the job or Defendant's business interests, and it just added further offensive context to his already creepy presence and influence in Plaintiff's work environment.

48.   Plaintiff complained to SW about KG's comments and behavior a third time, in March 2019, and again SW listened, acted like she was sympathetic, but KG's comments and behavior continued.

49.    By this time, Plaintiff observed that KG was aware that she had complained about his behavior, and had developed animus toward her.

50.    KG acted upon that apparent animus by bombarding her with assignments to perform various tasks during the work day, leaving multiple notes for her, which in the aggregate was far more work than she could possibly complete in the time that she was scheduled to work.

51.    Having struck out in her efforts to secure remedial action from SW, Plaintiff contacted Defendant's corporate human resources department and related all of the issues that she had reported to AL, JW and SW.

52.    The human resources employee, a male whose name may have been "John" reacted similar to SW, i.e., saying that he was concerned and sympathetic, and would look into it, but no remedial action was taken by Defendant regarding KG.

53.    Plaintiff went as far as threatening to quit when she discussed her complaints with SW, and later with John, but they repeatedly asked her not to, and to give the company a chance to rectify the situation.

54.    Plaintiff asked to be transferred to a different department, a request SW and PW said would be granted, as soon as they could create an opening in the Seasonal Department, but the transfer never happened.

55.    Plaintiff developed a feeling of being trapped and falling into a deep, dark hole.

56.    Coworkers referred to Plaintiff as being KG's "bitch."

57.    KG's conduct made Plaintiff dread going into work.

58.    Plaintiff had no other employment opportunities close to home that she was qualified for and would provide the flexible work hours and schedule that suited her family responsibilities.

59.    Plaintiff increasingly became anxious, despondent and depressed.

60.    On or about April 3, 2019, as Plaintiff was preparing to go to work, Plaintiff experienced a serious mental health episode that required her immediate hospitalization.

61.    Plaintiff has a history of suffering from post-traumatic stress disorder ("PTSD"), and the workplace stress that she was experiencing over the previous several months triggered the mental health episode.

62.    Plaintiff's husband called her absence into Defendant, to explain why she would be unable to make it to work that day.

63.    After Plaintiff was discharged from the hospital, on or about April 6, 2019, Plaintiff met with SW and AL to explain that she would not be able

to return to work at least two weeks, pending approval to do so by her doctors.

64.    The letterhead on the doctor's note that Plaintiff gave SW and AL to certify her inability to return to work indicated that it was a "psychiatric" facility, which seemed to catch SW's attention as she seemed particularly nosey about Plaintiff's illness.

65.    AL simply asked Plaintiff if she was okay, to which Plaintiff answered by stating, only, that she needed a "mental break."

66.     AL and SW wished Plaintiff well in recovering, and asked her to keep them posted.

67.    Two-weeks later, Plaintiff's doctor provided her with a medical certification extending her medical leave, and Plaintiff took the note into Defendant's store and met with SW and JW.

68.    With the door closed for privacy, SW asked Plaintiff to explain "what the hell is going on?"   SW seemed particularly interested in the psychiatric component of Plaintiff's inability to return to work.

69.    Feeling obligated to disclose her specific condition, Plaintiff explained the specifics of why she was hospitalized, the nature of the mental health episode that she suffered, some of her mental health history, including the fact that she suffered from PTSD.

70.   SW and PW appeared more to be more judgmental than they were concerned or surprised with the seriousness of Plaintiff's condition.

71.   The meeting ended with Plaintiff's leave being extended, and SW and JW asking Plaintiff to keep them posted on her ability to return to work.

72.   At some point after the meeting ended, and Plaintiff left Defendant's building, JW disclosed what he learned from Plaintiff about her medical condition and the reason for her leave to KG.

73.   KG, in turn, started spreading gossip about Plaintiff, and disclosing specific details about Plaintiff's medical condition, and the mental health episode that she experienced, to Plaintiff's coworkers.

74.   Multiple coworkers reported to Plaintiff that KG was discussing her medical condition and specifics about her mental health episode with other employees.

75.   Plaintiff was humiliated by Defendant's inability to maintain confidence regarding the information she provided about her mental health condition.

76.   Plaintiff posted a Facebook post for her friends to see, complaining about the improper disclosure of her confidential information about her medical condition and disability from work.

77.    Plaintiff also called and left a message for Defendant's human resources employee, John, complaining about the confidential information regarding her mental health condition being improperly disclosed to KG – Plaintiff speculated that SW disclosed her confidential health condition information to KG, but she later learned that JW actually made the disclosure.

78.    SW then contacted Plaintiff to confirm that she saw Plaintiff's Facebook post, was upset that the information was improperly disclosed, and confirm that it "absolutely should not have happened."

79.    Defendant then conducted an investigation into the incident.

80.    KW denied knowing about Plaintiff's condition, or the reason why she was unable to return to work.

81.    JW admitted disclosing to another employee that Plaintiff's absence from work was due to a "mental health condition."

82.    Because the other employees that Plaintiff identified as witnesses perceived that their jobs were in jeopardy if they confirmed being told specifics about Plaintiff's health condition, they each predictably denied knowing anything when they were interviewed during the investigation.

83.    Defendant also investigated the complaints that Plaintiff had made to Defendant's store management about KG's comments and

behavior, and KG even admitted to some of the comments, with Defendant's investigator reported were inappropriate.

84.    Even though Defendant's investigation confirmed that JW had improperly shared confidential information about Plaintiff's mental health condition and basis for her medical leave, and that KG admitted making at least some of the inappropriate comments Plaintiff attributed to him, Defendant concluded that most of Plaintiff's complaint was unsubstantiated and decided to give JW a written warning and KG a counseling memo.

85.    Plaintiff was mortified by Defendant's final response to her complaints, especially in light of Defendant's published policies prohibiting sexual harassment and engaging in conduct that adversely affects the work environment for other employees, and that assures employees that their confidential health information will not be shared or disclosed to others not in a position where they need to know.

86.    Defendant failure to take prompt, effective and meaningful remedial action against KG and JW triggered more symptoms of Plaintiff's PTSD condition, and as it signaled to Plaintiff that she would continue to be required to work in a hostile work environment.

87.    Plaintiff's treating physicians and counselor agreed that Plaintiff should not return to work with Defendant, because her symptoms had not

improved, and because Defendant could not provide Plaintiff with a safe work environment.

88.     Thereafter, Defendant terminated Plaintiff's employment due to her inability to return to work.

## COUNT I

## HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT IN VIOLATION OF TITLE VII

89.     Plaintiff repeats and realleges each and every paragraph of this Complaint as though fully set forth herein.

90.     At all times material hereto, Plaintiff was an "employee," and Defendant was her "employer," as that term is defined by Title VII.

91.     At all times material hereto, Defendant was an "employer," as that term is defined in Title VII.

92.     At all times material hereto, Defendants KG, JW, SW and AL were each employees of Defendant and each acting as Defendant's "agent", as that term is defined by Title VII.

92.     KG's actions as described above created a work environment for Plaintiff that was offensive and sexually hostile that violated Plaintiff's civil rights that are guaranteed by Title VII.

93.     KG's actions were intentional and malicious.

16

94.     Despite their written policies that claim to prohibit sexual harassment of employees, Defendant's store management, i.e., AL, JW, SW and "John," each failed to take adequate measures to police and enforce its policies, failed to train and educate its employees (including but not limited to KG) regarding is policies that prohibit sexual harassment, or and failed to eliminate acts of sexual harassment by its agents, representatives and employees, such as KG.

95.     KG's repeated, inappropriate, sexually offensive conduct was severe and pervasive, and permeated Plaintiff's work environment to the point of adversely affecting the terms and conditions of Plaintiff's employment with Defendant.

96.     Defendant had actual knowledge that KG was creating a sexually hostile work environment for Plaintiff beginning with Plaintiff's complaints to AL in mid-November 2018, and Defendant and its agents failed to respond with effective and meaningful remedial action.

97.     Defendant's failure to adequately and effectively remedy the sexually hostile work environment Plaintiff was experiencing severely altered the terms and conditions of Plaintiff's employment, resulting in her mental health disability and eventual termination from employment.

98.    Defendant's failure to implement prompt and effective remedial action once they had notice of Plaintiff's sexual harassment complaints, constitute a violation of Plaintiff's civil rights established by Title VII.

99.    As a direct and proximate result of the unlawful sexual harassment as described above, Plaintiff has suffered damages including but not limited to the loss of employment and employment opportunities with Defendant, the loss of past and future employment income and fringe benefits, damage to her personal and occupational reputation, humiliation, stress, anxiety, and mental and emotional distress.

WHEREFORE, Plaintiff respectfully prays this Honorable Court to enter its Judgment in her favor and against Defendant, in whatever amount is shown to be established by the evidence, together with appropriate injunctive relief, interest, costs, and reasonable attorneys' fees, and such other relief pursuant to Title VII and as the Court deems equitable.

## COUNT II

## RETALIATION IN VIOLATION OF TITLE VII

100.   Plaintiff incorporates each and every paragraph of this Complaint as though forth fully set forth herein.

101.  Defendant had a duty under Title VII to refrain from any acts or actions in retaliation against Plaintiff as a result of her making a complaint of sexual harassment.

102.  Defendant's management agents, including JW, knew that they were required to maintain confidentiality regarding Plaintiff's medical and disability information.

103.  JW was also aware that Title VII and Defendant's policies strictly prohibited employees, especially supervisory employees, from retaliating against an employee based upon the employee making a complaint of sexual harassment.

104.  JW had become friends with KG and knew that Plaintiff had made multiple complaints to Defendant's store management that KG was creating a sexually hostile work environment for her.

105.  JW demonstrated repeatedly that he did not care about the conditions that Plaintiff was complaining about, and ignored her requests that he take remedial action to stop KG from making the sexually offensive comments, or engaging in the sexually offensive conduct, that she complained about.

106.  After meeting with Plaintiff and SW in mid-April 2019, and learning about Plaintiff's confidential mental health condition, JW decided

that Plaintiff was a problem, and that Plaintiff was potentially putting KG's continued employment in jeopardy, and as a response, he improperly, and illegally, disclosed information about Plaintiff's health condition to KG and other employees of Defendant.

107. JW and KG then retaliated against Plaintiff by attempting to disparage Plaintiff and impugn her credibility by characterizing her as mentally and emotionally unstable and/or ill.

108. Defendant had actual knowledge of JW and KG's retaliatory conduct and failed to take adequate, meaningful or effective remedial action against them.

109. Defendant's decision to slap JW and KG on the risk for disclosing Plaintiff confidential mental health information to their coworkers sent a clear signal to Plaintiff, intentionally, that Defendant would not remedy the hostile work environment that Plaintiff was required to work in.

110. As a direct and proximate result of the unlawful retaliation described above, Plaintiff has suffered damages including but not limited to disabling PTSD symptoms, the loss of employment and employment opportunities with Defendant, the loss of past and future employment income and fringe benefits, damage to her personal and occupational reputation, humiliation, stress, anxiety, and mental and emotional distress.

WHEREFORE, Plaintiff respectfully prays this Honorable Court to enter its Judgment in her favor and against Defendant, in whatever amount is shown to be established by the evidence, together with appropriate injunctive relief, interest, costs, and reasonable attorneys' fees, and such other relief pursuant to Title VII and as the Court deems equitable.

## COUNT III

### HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT IN VIOLATION OF THE ELLIOT-LARSEN CIVIL RIGHTS ACT

111. Plaintiff repeats and realleges each and every paragraph of this Complaint as though fully set forth herein.

112. At all times material hereto, Plaintiff was an "employee," as that term is defined by the ELCRA.

113. At all times material hereto, Defendant was Plaintiff's "employer" as that term is defined by the ELCRA.

114. At all times material hereto, KG, AL, JW, SW and AL were each employees of Defendant, and each acting as Defendant's "agent," as that term is used by ELCRA.

115. KG's conduct, as described above, also constitutes the creation of a sexually hostile work environment in violation of the ELCRA.

116. KG's actions were intentional and malicious.

21

117. Despite its written policies that claim to prohibit sexual harassment of employees, Defendant's management agents, AL, JW, SW and John, failed to take adequate measures to police and enforce its policies, failed to train and educate its employees (including but not limited to KG) regarding is policies that prohibit sexual harassment, or and failed to eliminate acts of sexual harassment by its agents, representatives and employees, such as Defendant Parent.

118. As a direct and proximate result of Defendant's failure to adequately and fairly respond to Plaintiff's multiple complaints about sexual harassment by KG, Defendant maintained a work environment for Plaintiff that was sexually offensive and hostile.

119. Defendant's failure to implement prompt and effective remedial action once they knew about Plaintiff's sexual harassment complaints, also constitute a violation of Plaintiff's civil rights established by the ELCRA.

120. Therefore, Defendant is vicariously liable for the sexual harassment of Plaintiff by KG.

121. As a direct and proximate result of the illegal sexually hostile work environment created by Defendant and its agents, and Defendant's failure to adequately respond to Plaintiff's complaint with appropriate remedial corrective action, the terms, conditions and privileges of Plaintiff's

employment with Defendant was adversely affected, ultimately resulting in Plaintiff's mental health disability and ultimately her termination from employment with Defendant.

122. As a direct and proximate result of the unlawful sexual harassment described above, Plaintiff has suffered damages including but not limited to a permanent mental health disability, the loss of employment and employment opportunities with Defendant, the loss of past and future employment income and fringe benefits, damage to her/his personal and occupational reputation, humiliation, stress, anxiety, and mental and emotional distress.

WHEREFORE, Plaintiff respectfully prays this Honorable Court to enter its Judgment in her favor and against Defendant in whatever amount is shown to be established by the evidence, together with appropriate injunctive relief, interest, costs, and reasonable attorneys' fees pursuant to MCL 37.2801(1) and (3), and such other relief the Court deems equitable.

## COUNT IV

### RETALIATION IN VIOLATION OF
### THE ELLIOTT-LARSEN CIVIL RIGHTS ACT

123. Plaintiff repeats and realleges each and every paragraph of this Complaint as though fully set forth herein.

124.  Like Title VII, the ELCRA prohibits employers like Defendant and its agents from discharging and otherwise retaliating against employees like Plaintiff for making a complaint of sexual harassment.

125.  The acts of retaliation by Defendant's management agent, JW, and KG, which violate Title VII, as outlined in Count II, also violated the retaliation prohibitions imposed by the ELCRA.

126   As a direct and proximate result of Defendants illegal retaliation against Plaintiff, the terms, conditions and privileges of Plaintiff's employment with Defendant were adversely affected, ultimately resulting in Plaintiff's permanent mental health disability and termination from employment with Defendant.

127. As a direct and proximate result of the unlawful retaliation described above, Plaintiff has suffered damages including but not limited to permanent mental health disability, the loss of employment and employment opportunities with Defendant, the loss of past and future employment income and fringe benefits, damage to her personal and occupational reputation, humiliation, stress, anxiety, and mental and emotional distress.

WHEREFORE, Plaintiff respectfully prays this Honorable Court to enter its Judgment in her favor and against Defendant in whatever amount is shown to be established by the evidence, together with appropriate

injunctive relief, interest, costs, and reasonable attorneys' fees pursuant to MCL 37.2801(1) and (3), and such other relief the Court deems equitable.

## COUNT V

## <u>VIOLATION OF THE AMERICANS WITH DISABILITIES ACT</u>

128.   Plaintiff repeats and realleges each and every paragraph of this Complaint as though fully set forth herein.

129.   At all times material hereto, Plaintiff was an "employee," and Defendant was her "employer," as that term is defined by the ADA.

130.   At all times material hereto, Defendant was an "employer," as that term is defined by the ADA.

131.   At all times material hereto, Defendants KG, JW, SW and AL were each employees of Defendant and each acting as Defendant's "agent", as that term is defined by the ADA.

132.   Pursuant to Section 112(d)(4)(C) of the ADA, i.e., 42 U.S.C § 12112(d)(4)(C), Defendant was required to treat all information obtained from an employee like Plaintiff regarding her medical condition and/or history of any medical condition as confidential, except that supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations.

133.  Defendant's written policies expressly assure all employees like Plaintiff that it will treat all information obtained regarding her medical condition and/or history of any medical condition as confidential.

134.  JW violated Plaintiff' rights guaranteed by Section 112(d)(4)(C) of the ADA by disclosing specifics about Plaintiff's confidential mental health condition and disability to other coworkers not in a position to need to know, including KG.

135.  Defendant is liable for JW's violation of Plaintiff's confidentiality rights under the ADA, because he was at all times acting as Defendant's agent when he met with Plaintiff and obtained her confidential medical information.

136.  As a direct and proximate result of Defendant's violation of Plaintiff's confidentiality rights under the ADA, the terms, conditions and privileges of Plaintiff's employment with Defendant were adversely affected, ultimately resulting in Plaintiff's permanent mental health disability and termination from employment with Defendant.

137.  As a direct and proximate result of Defendant's violation of Plaintiff's confidentiality rights under the ADA described above, Plaintiff has suffered damages including but not limited to permanent mental health disability, the loss of employment and employment opportunities with

Defendant, the loss of past and future employment income and fringe benefits, damage to her personal and occupational reputation, humiliation, stress, anxiety, and mental and emotional distress.

WHEREFORE, Plaintiff respectfully prays this Honorable Court to enter its Judgment in her favor and against Defendant in whatever amount is shown to be established by the evidence, together with appropriate injunctive relief, interest, costs, and reasonable attorneys' fees pursuant to 42 U.S.C. § 12205, and such other relief the Court deems equitable.

## COUNT VI

## VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

138.  Plaintiff repeats and realleges each and every paragraph of this Complaint as though fully set forth herein.

139.  Like the ADA, the PWDCRA requires employers like Defendant and its agents to treat all information obtained from an employee like Plaintiff regarding her medical condition and/or history of any medical condition as confidential, and prohibits such employers from disclosing such information to coworkers and others not in a position where they need to know for purposes of developing and providing a reasonable accommodation.

140.  JW violated Plaintiff' rights guaranteed by the PWDCRA by disclosing specifics about Plaintiff's confidential mental health condition and disability to other coworkers not in a position to need to know, including KG.

141.  Defendant is liable for JW's violation of Plaintiff's confidentiality rights under the PWDCRA, because he was at all times acting as Defendant's agent when he met with Plaintiff and obtained her confidential medical information.

142   As a direct and proximate result of Defendant's violation of Plaintiff's confidentiality rights under the PWDCRA, the terms, conditions and privileges of Plaintiff's employment with Defendant were adversely affected, ultimately resulting in Plaintiff's permanent mental health disability and termination from employment with Defendant.

143.  As a direct and proximate result of Defendant's violation of Plaintiff's confidentiality rights under the PWDCRA described above, Plaintiff has suffered damages including but not limited to permanent mental health disability, the loss of employment and employment opportunities with Defendant, the loss of past and future employment income and fringe benefits, damage to her personal and occupational reputation, humiliation, stress, anxiety, and mental and emotional distress.

WHEREFORE, Plaintiff respectfully prays this Honorable Court to enter its Judgment in her favor and against Defendant in whatever amount is shown to be established by the evidence, together with appropriate injunctive relief, interest, costs, and reasonable attorneys' fees pursuant to MCL 37.1606(1) and (3), and such other relief the Court deems equitable.

## DEMAND FOR TRIAL BY JURY

NOW COMES the Plaintiff, Stacey Haire, by and through her attorneys, GASIOREK MORGAN, and hereby demands for trial by jury in this cause.

Respectfully Submitted,

**GASIOREK MORGAN**

s/Sam Morgan_____
 Sam Morgan (P-36694)
Attorneys for Plaintiff
30500 Northwestern Hwy, Suite 425
Farmington Hills, Michigan 48334
(T) (248) 865-0001
(F) (248) 865-0002
smorgan@work-lawyers.com

Dated: April 28, 2021

29